UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   Criminal Action No. 1:21-cr-10296-IT |
| | * |
| JOHN DOE, | * |
| a.k.a. an individual with initials L.M., | * |
| | * |
| Defendant. | * |

MEMORANDUM & ORDER

March 5, 2025

TALWANI, D.J.

On November 7, 2024, a jury convicted Defendant on all counts of a Superseding Indictment [Doc. No. 95] charging distribution of and possession with intent to distribute mixtures and substances containing fentanyl or a fentanyl analogue in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi). At the close of the government's evidence, Defendant filed a Motion for Judgment of Acquittal [Doc. No. 150] pursuant to Fed. R. Crim. P. 29(a), seeking an acquittal on all four counts. The court reserved decision. See Fed. R. Crim. P. 29(b). Following the jury verdict, Defendant filed his Renewed Motion for a Judgment of Acquittal [Doc. No. 151] seeking a judgment of acquittal on Count III, pursuant to Fed. R. Crim. P. 29(c). For the following reasons, Defendant's motions are DENIED.

**I.      Legal Standard**

To prevail on a motion for judgment of acquittal under Rule 29, a defendant must "show that the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offenses beyond a reasonable doubt." United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018) (citing United States v. Gabriele, 63 F.3d 61, 67 (1st Cir. 1995)). In making that determination, the court does not "weigh the

evidence or make any credibility judgments, as those are left to the jury." United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (citing United States v. Ayala-Garcia, 574 F.3d 5, 11 (1st Cir. 2009)). Instead, the court "resolve[s] all credibility disputes in the verdict's favor," id. (citing United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)), and "examine[s] the evidence—direct and circumstantial—as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict," United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018) (internal quotations omitted). Accordingly, the jury verdict must be upheld, unless, viewing the evidence in this manner, no rational jury "could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

"If the court reserves decision [on a motion for a judgment of acquittal], it must decide the motion on the basis of the evidence at the time the ruling was reserved." See Fed. R. Crim. P. 29(b).

## II. Evidence Presented at Trial

The evidence at trial, in the light most favorable to the verdict, was as follows:

### A. *Facts at the Close of the Government's Evidence*

This case involves two completed controlled purchases of drugs from Defendant,[1] a subsequent operation when Defendant was arrested with drugs on his person,[2] and a search of a

---

[1] The sale of these drugs is charged in Counts I and IV of the Superseding Indictment. Count I charged that Defendant knowingly and intentionally distributed and possessed with intent to distribute 40 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2phenylethyl)-4-piperidinyl] propenamide ("fentanyl"), on or about June 9, 2021. Count IV charged that Defendant knowingly and intentionally distributed and possessed with intent to distribute 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, on or about July 19, 2021.

[2] The drugs on Defendant's person are charged in Count II, which charged that Defendant knowingly and intentionally possessed with intent to distribute 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, on or about September 16, 2021.

2

stash house where a larger quantity of drugs was seized.[3]

### The June 9, 2021 Controlled Purchase

The jury heard recordings and read translations of multiple calls between the Defendant and a confidential source on June 9, 2021, arranging a drug sale of 50 grams of fentanyl to take place that day, as well as a video recording and translation of the drug sale actually taking place. See Ex. 1A June 9 Call Recording; Ex. 1B June 9 Call Translation; Ex. 2A June 9 Deal Recording; Ex. 2B June 9 Deal Translation; Ex. 10A June 9 Afternoon Call Recording; Ex. 10B June 9 Afternoon Call Translation. Drug Enforcement Administration ("DEA") Special Agent Ryan Glynn also testified that DEA agents searched the confidential source's person and vehicle before the June 9 drug purchase and found no money, weapons, or narcotics.[4] Following the purchase, agents recovered drugs received from Defendant by the confidential source. Ex. 3 June 9, 2021 Controlled Buy Drugs. The jury heard testimony from Vadim G. Astrakhan, a DEA Chemist, that he determined the net weight of the drugs received by the confidential source on June 9 to be 50.1 grams.[5]

---

[3] The drugs found in the stash house are charged in Count III, which charged that Defendant knowingly and intentionally possessed with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of (N-( 4-Fluorophenyl)-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide) ("p-Fluorofentanyl"), an analogue of fentanyl, and 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, on or about September 16, 2021.

[4] Agent Glynn testified that it is DEA policy to search the confidential source and the source's vehicle before using the source to make a purchase or meet with the target of an investigation.

[5] Astrakhan testified that his colleague originally determined the weight of the drugs to be 50.9 grams, but that some of the weight of the drugs was used up in the course of the DEA's processing, handling, and analyzing of the drugs.

### The July 19, 2021 Controlled Purchase

The jury also received recordings and translations of calls between a confidential source and Defendant, arranging a July 19, 2021 controlled drug purchase. See Exs. 4A, 4B, 5A, 5B, 6A, 6B, 7A, 7B. Special Agent Glynn testified that he was present when the confidential source made the phone calls on July 19 to set up the controlled purchase and testified that he observed the source making those calls by dialing a 347 area-code phone number ending in 1155. The jury received stipulations between the government and defense that the recordings of those calls were true and accurate, and that the translations of those calls accurately attributed statements made by Defendant and the confidential source.

Agent Glynn further testified to observing Defendant driving a white Honda CR-V on July 19. GPS tracking data showed the vehicle stopped near 53 Dix Street in Dorchester, MA, between 10:15 a.m. and 10:50 a.m. See Ex. 15 GPS Data Google Earth File.[6] Agent Glynn testified that he observed the vehicle parked near 53 Dix Street that day and that he saw Defendant leave the driver seat of the vehicle and walk towards 53 Dix Street. GPS tracking data then showed the vehicle traveling to Lawrence, where the July 19 controlled purchase of narcotics was scheduled to take place.

The jury received a video recording and translation of the drug exchange taking place on July 19, at a restaurant in Lawrence, MA. See Exs. 8A, 8B. The jury also received evidence of the narcotics received from the controlled source, which were packaged into plastic baggies wrapped in green cellophane. See Ex. 9A July 19 Drugs; Ex. 9B July 19 Drug Packaging. The

---

[6] GPS tracking data of the white Honda CR-V also showed the vehicle stopped near 53 Dix Street on July 14, 15, 21, 23, 30, 31, and on August 1, 2021. See Ex. 15 GPS Data Google Earth File.

4

jury heard testimony from DEA Chemist Astrakhan that he determined the net weight of the drugs received by the confidential source on July 19 to be 102.5 grams.[7] Agent Glynn testified that the confidential source and his vehicle were searched for money, weapons, and narcotics, with negative results, before the source departed to participate in the controlled buy. The jury also received photographs taken of Defendant entering and exiting the driver side of the white Honda CR-V on July 19, outside the restaurant where the controlled purchase of narcotics took place. See Exs. 84, 86, 87.

### The September 16, 2021 Buy-Bust Operation

DEA Special Agent Glen Coletti testified that law enforcement planned a buy-bust operation for September 16, 2021..[8] Agent Coletti testified that as part of that operation, a confidential source placed an order for 125 grams of fentanyl from Defendant, to be placed in two packages of 100 grams and 25 grams. The purpose of law enforcement in making this request was that the 25-gram package might require Defendant to package the specially-requested amount and thus that Defendant would lead investigators to the location where the drugs were stored.

Agent Coletti testified that on the morning of September 16, Defendant was observed leaving his residence on West Newton Street in Boston carrying a black satchel and entering the white Honda CR-V, after which investigators followed the vehicle, through GPS tracking, to two

---

[7] The jury heard testimony that Astrakhan's colleague who originally weighed the drugs determined the weight to be 103.6 grams.

[8] Agent Coletti testified that as part of the buy-bust operation, investigators planned to arrest Defendant as he met with a controlled source to deliver an order of fentanyl and to execute a search-and-seizure warrant for the Defendant and his residence at 76 West Newton Street in Boston.

other locations[9] and then to Dix Street, where Agent Coletti observed the white Honda CR-V parked in the vicinity of 53 Dix Street. GPS tracking data showed the Honda CR-V parked near that address between 11:17 and 11:50 a.m. See Ex. 15 GPS Data Google Earth File. Agent Coletti then observed Defendant enter the Honda CR-V, after which time agents followed the car to another address in Lawrence, MA, where Defendant stopped for six or seven minutes, and then to the Lawrence location that had been arranged for the controlled-buy operation. Agent Coletti testified that Defendant was arrested at that location as he exited his vehicle, with 125 grams of fentanyl, packaged into 100 gram and 25 gram packages, found on his person.[10]

### The September 16, 2021 Search of 53 Dix Street

Agent Coletti testified that he and other agents found keys in the driver's side door of the Honda CR-V that Defendant was driving. See Ex. 12 Key Ring Seized from Defendant. Agent Coletti testified that after Defendant responded to the question of what location the keys went to, agents traveled to 53 Dix Street. Agent Coletti testified that agents, using the key seized from Defendant, unlocked the external door to the 53 Dix Street basement apartment and the interior door to a back left room in that apartment. The jury received photos of keys fitting into the locks of those doors. See Exs. 37, 38.

Agent Coletti testified that when searching the back left room of the 53 Dix Street apartment, agents located a black canvas bag stashed behind a wall vent. He testified about, and

---

[9] Investigators followed Defendant to an address on Ames Street in Boston, then to the Registry of Motor Vehicles in Braintree.

[10] The jury heard testimony from Detective Manuel Suarez, who found the narcotics in one of Defendant's pant pockets during a pat-down of Defendant during the arrest. The drugs seized were introduced into evidence. See Ex. 11A Sept. 16 Drugs Found on Defendant; Ex. 11B Sept. 16 Drug Packaging Found on Defendant. The jury heard testimony from DEA Chemist Astrakhan that he determined the net weight of the drugs found on Defendant's person on September 16 to be 115.7 grams.

the jury received photos of, the contents of the bag, which included several packages containing narcotics—three wrapped in brown tape, two wrapped in green cellophane, and two wrapped in clear plastic wrap. See Ex. 46 Photograph of Black Bag Contents. The jury also received a photo showing other items found in the room, including a green roll of cellophane and two scales. See id. No evidence was introduced as to any drugs found in the room apart from those found behind the wall vent. Agent Coletti testified that, based on his experience in law enforcement, he believed the back left room in 53 Dix Street was a stash house.

Agent Coletti testified further that, at 53 Dix Street, he interacted with the landlord of the building and with someone named Francisco Rosario, who identified himself as a resident of the basement. Agent Coletti testified that no one told him they recognized Defendant, based on a photograph they were shown of him.

B. *Additional Facts Presented as Part of the Defendant's Case in Chief*

The jury heard testimony from Stacey Loggins, a senior fingerprint specialist for the DEA who examined the drug packaging materials seized from the basement of 53 Dix Street. See Ex. 16B Sept. 16, 2021 Drug Packaging. Loggins testified that she did not find fingerprints on any of the materials sent to her for testing. She further testified that she was not sent the digital scales, a cellophane dispenser, or other items seized from 53 Dix Street, even though she frequently receives such items for testing and sometimes successfully identifies fingerprints on such items. She testified that, had she been present at the scene, she would have chosen for fingerprint testing plastic bags, scales, a roll of tape, a roll of cellophane, and bundles of plastic wrapping for processing, all of which were photographed at the crime scene. Loggins further testified that when she tests items submitted for fingerprinting, she successfully develops prints

7

approximately 25 percent of the time, and that someone would not ordinarily leave fingerprints if they handled items using gloves.

The jury also heard testimony from Eduardo Fernandez, the owner and landlord of 53 Dix Street. He testified that he did not recognize Defendant and that Defendant was not the person to whom Fernandez rented the basement room in 53 Dix Street. He further testified that he saved the phone number (347) 596-1155 for one of his tenants at 53 Dix Street under the name Pelota Besma. He testified that officers took a photo of the contact entry for Pelota Besma in his phone, on September 16, 2021. See Ex. 26 Pelota Besma Contact Information. Fernandez also testified that the basement rooms are designed for people to live in and that tenants paid rent by bringing rent payments to Brothers Super Market, a business Fernandez owns.

Fernandez testified further that he visited 53 Dix Street approximately once a month, to pick up rent from the third-floor tenant, and that he did not see who visits the building during the day or who stayed over at night, and that he did not know who had keys to particular rooms in the apartment. He further testified that he did not have written leases for any of the tenants and that he did not recognize the name Francisco Rosario.

Finally, the jury heard Agent Glynn testify that the Honda CR-V to which a GPS tracking device was affixed was not registered to Defendant but to a woman, and that Agent Glynn had observed, on at least one occasion, a woman operating the Honda. Agent Glynn further testified that Defendant was originally with the woman operating the Honda when she was observed driving the car.

### III.   Discussion

#### A.   *Counts One, Two, and Four*

Defendant's Motion for Judgment of Acquittal [Doc. No. 150] seeks a judgment of acquittal to be entered on all Counts of the Superseding Indictment on the grounds that "the

evidence, when viewed in a light most favorable to the government, fails to establish the elements of the offenses charged[.]" But Defendant offers no additional argument to support this conclusory statement, and Defendant's counsel conceded in her opening and closing arguments that the evidence was sufficient to sustain a conviction on Counts I, II, and IV.

The evidence, viewed in the light most favorable to the government, established that on June 9, July 19, and September 16, 2021, Defendant (1) actually possessed the requisite amount of a controlled substance; (2) with a specific intent to distribute it; and (3) did so knowingly and intentionally.

The jury received evidence that on June 9 and July 19, Defendant sold drugs as part of two controlled-buy operations. Such evidence included recordings and translations arranging the controlled buys, video recordings of the drug sales taking place, and testimony from a DEA chemist concerning the weight of the drugs received from the confidential source on both occasions.

As for September 16, the jury heard testimony from Agent Glen Coletti that a confidential source placed an order for 125 grams of fentanyl from Defendant to be sold on September 16, that Defendant was arrested at the arranged location for the sale, and that arresting officers found on Defendant's person fentanyl that, according to testimony from the DEA chemist, weighed 115.7 grams.

Based on such evidence, a rational jury could have concluded beyond a reasonable doubt that Defendant was guilty of Counts I, II, and IV.[11]

---

[11] Defendant did not present evidence following the close of the government's case that would have undermined the guilty verdict on Counts I, II and IV.

B.  *Count Three*

Defendant argues that this court must grant a judgment of acquittal on Count III because no rational jury could have found that the government proved that Defendant: (1) actually or constructively possessed the requisite amount of a controlled substance; (2) possessed such substance with a specific intent to distribute it; and (3) did so knowingly and intentionally. See Renewed Motion for a Judgment of Acquittal at 2-3 [Doc. No. 151].

1. Based on the Evidence at the Close of the Government's Case

Defendant's argument is primarily as to the first element—that the government failed to prove Defendant actually or constructively possessed 100 grams or more of fentanyl analog or 400 grams or more of fentanyl because the government did not show that Defendant knew of the drugs found hidden in the wall of the 53 Dix Street apartment. See id. at 2. His arguments as to the other two elements are similarly based on an alleged failure to show that Defendant knew of the drugs in the wall. See id. at 4.

The government argues in response that "[t]he evidence at trial established that the defendant constructively possessed the drugs at Dix Street." Gov't Opp. at 4 [Doc. No. 156] (emphasis added). Constructive possession "is shown by proving that the defendant had 'dominion and control over the area where the contraband was found.'" See United States v. Mendoza-Maisonet, 962 F.3d 1, 12 (1st Cir. 2020) (quoting United States v. Padilla-Galarza, 886 F.3d 1, 5 (1st Cir. 2018)). Constructive possession "can be joint, does not require actual ownership . . . and can be established through circumstantial evidence, though 'mere presence or association with another who possessed the contraband is insufficient.'" United States v. Hicks, 575 F.3d 130, 139 (1st Cir. 2009) (quoting United States v. DeCologero, 530 F.3d 36, 67 (1st Cir. 2008)).

This court finds that a rational jury could have found beyond a reasonable doubt that Defendant constructively possessed the drugs in the wall of 53 Dix Street, that he did so with the specific intent to distribute those drugs, and that he did so knowingly and intentionally. That is because there was specific evidence at the conclusion of the government's case, to find, beyond a reasonable doubt, that: (1) Defendant was a fentanyl dealer; (2) who picked up drugs from 53 Dix Street for sale; and (3) who had knowledge and control of the drugs in the wall of the back left room of the basement apartment.

*First*, the jury received ample evidence that Defendant was a drug dealer in June, July, and September, as detailed above in connection with Counts I, II, and IV, including testimony from Agent Coletti that a confidential source arranged to buy 125 grams of fentanyl from Defendant on September 16, and that Defendant was arrested with approximately 125 grams of the drug on his person that day, at the pre-arranged location for the sale. From this, a rational jury could conclude beyond a reasonable doubt that Defendant was engaged in the sale and distribution of fentanyl as of September 16, 2021.

*Second*, the jury received evidence that showed beyond a reasonable doubt that Defendant had access to the back left room of the basement of 53 Dix Street and that he used this room to store drugs for sale, including on September 16, the day of the buy-bust operation involving the specific request for 125 grams of fentanyl and the day on which the additional drugs were discovered at 53 Dix Street. Special Agent Glynn testified that he observed Defendant driving a white Honda CR-V on multiple occasions, including on September 16,

11

2021.[12] GPS tracking on that vehicle showed it stopped near 53 Dix Street on several occasions, including on the morning of September 16—when the vehicle was stopped near 53 Dix Street between 11:17 and 11:50 a.m.

The jury also heard testimony that Agents found keys in the Honda CR-V that unlocked both the external door to the 53 Dix Street basement apartment and the interior door to the back left room of the apartment—the room in which the drugs were found. The jury was also presented evidence that packaging for the drugs obtained in a controlled buy were concealed inside plastic baggies that were wrapped in green cellophane—the same kind of cellophane as that found at the 53 Dix Street basement apartment.

From this evidence, a rational jury could find, beyond a reasonable doubt, that even though no witness testified to seeing Defendant at the location, Defendant in fact had access to the back left room of 53 Dix Street and used the room to store drugs for sale.

*Finally*, while Defendant is correct that no witness testified to Defendant's knowledge of the drugs in the wall, the jury received ample circumstantial evidence that showed beyond a reasonable doubt that Defendant knew about the drugs in the wall of the back left room of the basement apartment and had control of this stash of drugs. There was no direct evidence that anyone else was in the basement room of the apartment during the relevant period. And even if others also had access to the room, constructive possession "can be joint[.]" Hicks, 575 F.3d at 139. The jury received evidence of the drugs stored in the wall but no evidence or testimony suggesting that investigators found drugs anywhere else in 53 Dix Street, showing that

---

[12] Based on this testimony, a rational jury could conclude beyond a reasonable doubt that Defendant was operating or at least inside the Honda CR-V on September 16, when it was stopped near 53 Dix Street.

Defendant was retrieving drugs from the stash in the wall and not some other location in 53 Dix Street.

Defendant contends that no rational jury could find beyond a reasonable doubt that he constructively possessed the drugs in the wall of 53 Dix Street because the evidence purportedly showed that Defendant was a relatively low-level drug runner. As support for that position, Defendant emphasized that investigators never found the tracked bills used in the controlled buys and claimed that this was because he had to give that money to his boss after his drug sales. To explain why Defendant possessed a key to the room in which the drugs were found, Defendant's counsel stated in closing arguments that Defendant only had a key to the room so that his boss receiving the money would not need to risk exposure to surveillance by leaving the apartment to collect the money.

But whether Defendant had a high or low position in distributing drugs is not the issue. Instead, the issue is whether Defendant knew about and had control over the drugs that were stored in the wall. For the reasons stated above, this court concludes that there was sufficient evidence for a rational jury to conclude, beyond a reasonable doubt, that Defendant trafficked in fentanyl, used 53 Dix Street to retrieve drugs, and knew about and had control of the stash of drugs in the wall of the back left room of the basement apartment of that address. Accordingly, there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt not only that Defendant constructively possessed the drugs in the wall, but also that he possessed such drugs with the intent to distribute and that he did so knowingly and intentionally.

    2.    Based on the Evidence at the Close of Defendant's Case

The evidence presented during Defendant's case in chief does not change the conclusion above. Before the close of the government's case, the jury heard testimony from Special Agent

Glynn stating that he observed, on July 19, the confidential source arranging to purchase drugs by dialing a number beginning with 347 and ending in 1155. As part of the Defendant's case in chief, the jury heard that those were the same starting and ending digits of the phone number of the individual who, according to the testimony of the landlord of 53 Dix Street, rented a room in the basement apartment of that building. That evidence adds to the strength of the jury verdict.

Defendant argues that it is common, in large drug operations, for individuals to exchange phones and use different numbers at different times. While that is a possibility, a rational jury could still conclude beyond a reasonable doubt, based on the overlap between the phone numbers, that Defendant was the individual storing drugs in in the basement room.

In closing arguments, Defendant emphasized the landlord's testimony to the effect that he did not recognize Defendant and that he rented the room to someone else. However, a rational jury could have deemed at least that portion of the landlord's testimony to not be credible, particularly given that the landlord did not recognize the name Francisco Rosario, even though a person by that name identified himself to investigators as a resident of the basement apartment. The jury also could have merely concluded that the landlord forgot who he rented the apartment to, as the landlord was testifying over three years after the September 16 buy-bust operation. Finally, even if the landlord rented the room to someone else, that fact would not negate Defendant's access to the room where he had a key to it.

During the government's rebuttal case, Agent Glynn testified that the Honda CR-V was registered to a woman and that Agent Glynn had observed a woman driving the car on at least one occasion. But during the government's case, Glynn had testified that he observed Defendant entering the white Honda CR-V on September 16 and observed him re-enter the vehicle after coming to and leaving Dix Street, and that Defendant was arrested exiting the white Honda CR-

V. There was no testimony to the effect that anyone else was seen driving the vehicle on September 16, so as to undermine the conclusion that Defendant was the individual driving the vehicle as it was being tracked with a GPS-tracking device.

Defense counsel further stressed in closing arguments that Stacey Loggins, the fingerprint examiner, testified that she found no fingerprints on the items seized from the wall of the basement apartment. However, Loggins also testified that she only picks up fingerprints from approximately 25 percent of items sent to her, and that someone could avoid leaving fingerprints on items by wearing gloves. A rational jury could have chosen not to place significant weight on the lack of fingerprints on the items seized from 53 Dix Street.

Accordingly, the evidence presented during the Defendant's case does not undermine the conclusion that Defendant trafficked in fentanyl, used 53 Dix Street to retrieve drugs, and knew about and had control of the stash of drugs in the wall of the back left room of the basement at that address, such that he was guilty of Count III.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion for Judgment of Acquittal [Doc. No. 150] and Renewed Motion for a Judgment of Acquittal [Doc. No. 151] are DENIED.

IT IS SO ORDERED.

March 5, 2025                                   /s/ Indira Talwani
                                                United States District Judge